UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                :

MATTHEW PALMER,                         :
                                                :
               Plaintiff,             :
                                                  :
           -v-                   :            23 Civ. 6951 (JPC)
                                                :
STARBUCKS CORPORATION *et al.*,      :        OPINION AND ORDER
                                              :
               Defendants.          :
                                              :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Plaintiff Matthew Palmer brings this action against his former employer, Starbucks Corporation, and several individuals in management at Starbucks, alleging a discriminatory work environment and retaliation, in violation of Title VII of the Civil Rights Act of 1964, the New York Executive Law, and the New York City Administrative Code. Defendants have moved to compel arbitration, arguing that Palmer's claims are subject to an arbitration agreement. In support, Defendants have presented undisputed evidence of the onboarding process at Starbucks for non-managerial retail employees, showing that Palmer would have been required to electronically sign a document titled "Starbucks Mutual Arbitration Agreement" (the "Arbitration Agreement") in April 2015 before beginning his employment as a barista. Palmer's arguments that he does not recall signing the Arbitration Agreement and that he cannot find an email confirming his execution of that agreement are insufficient to create a genuine dispute of material fact as to whether he entered into an agreement to arbitrate—particularly given his acknowledgement that he filled out paperwork electronically as part of his onboarding. The Court therefore grants Defendants' motion to compel arbitration and stays this action pending arbitration.

## I.    Background

### A.    Relevant Facts[1]

### 1.    Palmer's Employment Discrimination Claims

In or around April 2015, Palmer began working at a Starbucks location at 1500 Broadway in Manhattan. Complaint ¶¶ 6-12. The individual Defendants held various managerial roles at the Starbucks: Georgine Bazemore was the assistant manager of the 1500 Broadway location, *id.* ¶ 8, Jessie Brugler was the store's manager, *id.* ¶ 9, and Taz Mbodje was the District Manager for various Starbucks stores, including the one where Palmer worked, *id.* ¶ 10. As alleged, each of these individuals was empowered to make decisions regarding Palmer's employment. *Id.* ¶¶ 8-10.

Palmer began a gender transition process in May 2017 and informed his supervisors and co-workers that he identified as male. *Id.* ¶ 14. Palmer initially changed his first name to Viktor in October 2017 before later changing it to Matthew. *Id.* ¶ 15. Palmer alleges that, after beginning this process, he began to experience harassment from other employees relating to his gender, sex, and gender transition, which continued until close to the point when Palmer's employment was terminated on March 24, 2019.

---

[1] The facts recited herein are taken from the allegations in the Complaint, Dkt. 1 ("Complaint"), and documents attached thereto or incorporated by reference therein; the Affidavit of Kathryn Daly, Starbucks's Director of Talent Acquisition, which was submitted by Defendants in support of their motion to compel, Dkt. 29-2 ("Daly Affidavit"); and Palmer's Declaration, which he submitted in opposing the motion, Dkt. 33 ("Palmer Declaration"). "Courts deciding motions to compel [arbitration] apply a standard similar to the one applicable to a motion for summary judgment," meaning that they can consider relevant evidence outside the complaint. *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 281 n.1 (2d Cir. 2019). "On a motion for summary judgment, the court considers all relevant, admissible evidence submitted by the parties and contained in the pleadings, depositions, answers to interrogatories, admissions and affidavits, and draws all reasonable inferences in favor of the non-moving party." *Id.*; *accord Meyer v. Uber Techs., Inc.*, 868 F. 3d 66, 74 (2d Cir. 2017); *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016).

More specifically, Palmer alleges that, over the course of approximately one-and-a-half years from October 2017 to March 2019, various co-workers repeatedly referred to him by using feminine pronouns, *id.* ¶¶ 22, 25, 27, 33, 50, 52, 56, 62, 69, disclosed his gender transition to customers and other employees, *id.* ¶¶ 48, 52, 62, and asked inappropriate questions about his genitals, surgery, and sexual preferences, *id.* ¶ 69; one co-worker threatened violence and repeatedly mocked him, *id.* ¶¶ 16, 18-19, 21, 25, 30-31; another co-worker inappropriately touched him, *id.* ¶¶ 28-29; another co-worker made derogatory comments to him, *id.* ¶ 44; he received a reduced work schedule, *id.* ¶ 55; and he requested an overnight shift, but two other employees were assigned that shift instead, *id.* ¶ 59. Palmer contends that he reported the alleged harassment to various supervisors at Starbucks who either failed to address the incidents despite some assuring they would or dismissed the incidents as misunderstandings, *id.* ¶¶ 20, 23-24, 26, 32, 34, 36, 38-44, 47-48, 50-53, 72; that he also contacted Partner Resources, a human resources hotline at Starbucks, *id.* ¶¶ 35, 37, 49, 73-75; and that, on May 3, 2018, he filed a report with Starbucks's Ethics and Compliance Department, *id.* ¶ 57. Palmer alleges that these incidents caused him to request a transfer to another Starbucks location, *id.* ¶ 72, and to contemplate suicide, *id.* ¶ 50.

The Complaint also indicates that some performance-related concerns were raised during Palmer's employment. On or about November 30, 2018, Brugler and a manager from another Starbucks store met with Palmer regarding allegations of beverage theft, apparently involving suspected unauthorized use of Palmer's employee number in making purchases. *Id.* ¶ 66. This resulted in Palmer "begrudgingly sign[ing]" "a corrective action form." *Id.* ¶ 67.[2] Then, on or about February 2, 2019, a supervisor yelled at Palmer when he attempted to make a drink for

---

[2] In addition, on or about October 5, 2018, Plaintiff was interviewed by Mbodje and a Starbucks investigator about financial loss at the store. Complaint ¶ 64.

himself before his shift started.  *Id.* ¶ 68.  On or about March 24, 2019, when Palmer reported for his scheduled shift, Brugler and Bazemore informed Palmer that his employment was being terminated for, according to Palmer, "the minor offenses of allegedly violating Defendant Starbucks' policies by stepping off the floor during his shift to make a beverage which was not properly paid for and by using profanity on the floor," apparently referring to the February 2, 2019 incident.  *Id.* ¶¶ 77-78.

### 2.     The Starbucks Onboarding Process and the Arbitration Agreement

Defendants' motion to compel rests on their assertion that Palmer electronically signed an agreement on April 13, 2015, which requires this employment dispute to be heard in arbitration. As Starbucks's Director of Talent Acquisition, Kathryn Daly is familiar with the company's hiring and employment practices and is responsible for overseeing the company's "applicant tracking and onboarding system for the Company's non-managerial hourly employees."  Daly Affidavit ¶¶ 2-4.  In her Affidavit, signed under penalty of perjury, *id.* at 9, Daly described in detail the onboarding system for non-managerial retail employees that was in place at Starbucks at the time Palmer applied for his job and was onboarded as a barista.  Daly additionally provided specific information regarding Palmer's hiring based on data obtained from the tracking and onboarding system that Starbucks used in 2015, called Retail Hour Hiring ("RHH"), and maintained by Kronos Inc. ("Kronos").  *Id.* ¶ 4.

From October 1, 2014 through May 22, 2017, which covers the time of Palmer's job application, applicants for retail non-managerial jobs at Starbucks were required to apply through the RHH online application process.  *Id.* ¶ 6.  Also, on or about October 1, 2014, Starbucks implemented a requirement that, as a condition of employment, all newly hired employees must

agree to arbitrate any claims that arise out of their employment, and began informing job applicants of this condition of employment on the online application form.  *Id.* ¶ 5.

On March 22, 2015, Palmer submitted an online job application via RHH.  *Id.* ¶ 7, Exh. A (first page of the employment application).  The online application required Palmer to create an account by providing his first name, last name, and email address, and by selecting a unique username and password.  *Id.*, Exh. A.  Palmer needed to complete these fields before he could continue with the online application process.  *Id.* ¶ 7.  Palmer was then directed to the "Pre-Application Disclosures" page.  *Id.* ¶ 8, Exh. B (screenshot from the "Pre-Application Disclosure" page).  This page expressly advised job applicants that their employment would be subject to an arbitration agreement, stating: "It is Starbucks policy that after October 1, 2014, all new hires shall be subject to an arbitration agreement as a condition of employment."  *Id.*, Exh. B.  The "Pre-Application Disclosures" page further advised that, "[i]n order to complete this job application," the applicant would "need to give consent to receive and respond to information in electronic form," and that the applicant should click "CANCEL" to decline to give that consent.  *Id.*  In addition, to continue past the "Pre-Application Disclosures" page, Palmer needed to click a button at the bottom of page that read, "I consent to receive and respond to notices in electronic form." *Id.* ¶ 9, Exh. B.  Records maintained by Kronos, attached as Exhibit C to the Daly Affidavit, further reflect that Palmer "consent[ed] to use electronic means to (a) sign this form and (b) receive the Disclosure Statement."  *Id.*, Exh. C at 9.  In addition, while completing this online application process over the RHH system, Palmer provided personal information including a physical address, an email address (the "Palmer Email"), and a Social Security number.  *Id.* ¶ 12.

Palmer subsequently received a job offer with Starbucks.  *See id.* ¶ 13.  Before commencing work, however, Palmer—like all other non-managerial hourly prospective employees at the time—

was required to complete the RHH online "Employee Onboarding" process. *Id.* To complete this process, Palmer was required to log into his RSS account using the username and password he had previously created during the job application process. *Id.* ¶ 14. The online Employee Onboarding form, similar to the job application form, also gave Palmer the option of consenting, or not consenting, to receive and respond to information electronically. *Id.* ¶ 14, Exh. D (screenshot of the "Electronic Consent" section of the Employee Onboarding form). The consent form advised the prospective employee to "close this browser window to cancel the Onboarding process" if the prospective employee wished to decline consent to the electronic transactions. *Id.*, Exh. D. The form further advised that, if the prospective employee should decide at any point during the process to withdraw that consent, the individual would "have to sign a corresponding paper authorization or consent form as needed if [the prospective employee] wish[ed] to continue with the process." *Id.* Further, to proceed with the online Employee Onboarding process, Palmer was required to click on a box that read, "I consent to receive and respond to notices in electronic form." *Id.* ¶ 16, Exh. D. In addition, the online Employee Onboarding process entailed the prospective employee agreeing to sign documents electronically by "using 'click' signature technology," and acknowledging his intent that "both the signature [he] inscribe[s] with the 'click' signature technology and the electronic record of it to be [his] legal signature to the document." *Id.* ¶ 16, Exh. E. Here too, Palmer was required to click a box reflecting his agreement to these terms to proceed with the online Employee Onboarding process. *Id.* ¶ 16; *see* Exh. E (reflecting field that reads, "Check here to agree").

After electronically signing the Employee Onboarding documents, Palmer was presented with various forms, including the Arbitration Agreement. *Id.* ¶ 17; *see id.*, Exh. F (listing three

forms: "W-4," "I-9," and "Arbitration Agreement").  The introductory language emphasized the

need to read each form and attest to its accuracy, before electronically signing:

> The following forms require your electronic signature.  The forms contain
> information that you have provided.  You must read each form before signing it and
> verify the truthfulness and accuracy of all information that you provided in that
> form.  Each form contains an attestation and/or declaration that you must make by
> signing the form.  You sign each form by clicking the "Sign" link associated with
> that form.  By signing each form, you acknowledge that you have read the
> attestation/declaration before signing it and you verify and attest to the accuracy of
> the information that you have provided.

*Id.*, Exh. F.  Palmer would not have been able to sign any of these forms, including the Arbitration

Agreement, without first viewing the form.  *Id.* ¶ 18.  As Daly explained:

> Once Plaintiff viewed the document, including the Arbitration Agreement, a "Sign"
> link appeared giving Plaintiff the option to electronically sign the document. . . .  In
> other words, the "Sign" link does not appear next to the "View" link until the user
> opens and views the Arbitration Agreement.  The "Sign All" link also cannot be
> clicked until the user opens and views all forms, including the Arbitration
> Agreement.

*Id.*; *see also id.*, Exh. F (screenshot demonstrating the "View" and "Sign" links).

One of these forms was the Arbitration Agreement.  The Arbitration Agreement provided,

in relevant part:

> <u>Mutual Agreement to Arbitrate</u>.  Starbucks and I agree to use binding individual
> arbitration to resolve any "Covered Claims" that arise between me and Starbucks,
> its subsidiaries and related companies, and/or any current or former employee of
> Starbucks or a related company (collectively, "Starbucks").  "Covered Claims" are
> those brought under any statute, local ordinance, or common law relating to my
> employment, including those concerning any element of compensation,
> harassment, discrimination, retaliation, recovery of bonus or relocation benefits,
> leaves of absence, accommodations, or termination of employment.
>
> **Except as provided herein, I understand and agree that arbitration is the only
> forum for resolving Covered Claims, and that both Starbucks and I waive the
> right to a trial before a judge or jury in federal or state court.**  The Arbitrator
> shall have the authority to award the same damages and other relief that would have
> been available in court pursuant to applicable law.

> Except as provided below, Starbucks and I agree that the Arbitrator — and not a court or agency — shall have exclusive authority to resolve any dispute regarding the formation, interpretation, applicability, enforceability, or implementation of this Agreement, including any claim that all or part of this Agreement is void or voidable.
>
> * * *
>
> <u>At Will Employment Unchanged by this Agreement</u>.  Nothing in this Agreement changes or in any manner modifies my employment-at-will relationship with Starbucks.  This Agreement shall remain in effect even after the termination of my employment with Starbucks.
>
> * * *

*Id.*, Exh. G ("Arbitration Agreement") at 1 (emphases in original).  According to Daly, Palmer electronically signed the Arbitration Agreement after viewing it, either by clicking the "Sign" link next to it or the "Sign All" link below it.  *Id.* ¶ 20, Exh. F.  This is also reflected in Palmer's RHH file, which shows that he signed the Arbitration Agreement on April 13, 2015, at 11:41 a.m.  *Id.* ¶ 21, Exh. H; *see id.* ¶ 21 ("The 'Onboarding' tab in Plaintiff's RHH file could not indicate that he electronically signed the Arbitration Agreement unless Plaintiff clicked on the 'Sign' link next to the Arbitration Agreement or the 'Sign All' link below the Arbitration Agreement while logged in to RHH.").[3]

After Palmer electronically signed the Arbitration Agreement, an email was automatically generated to the Palmer Email, *i.e.*, the email address that Palmer had provided when he established his RHH account, confirming that Palmer had executed the agreement.  *Id.* ¶ 22; *see id.* ¶ 7.  Palmer's RHH "Email History" records reflect that this confirmation email was sent to the Palmer Email on April 13, 2015.  *Id.*, Exh. I.  In addition, after electronically signing the Arbitration

---

[3] In a December 7, 2023 letter to the Court in anticipation of their motion to compel arbitration, Defendants note that "a technical issue has precluded Starbucks from recovering the [Arbitration] Agreement containing Plaintiff's electronic signature."  Dkt. 23 at 2.

Agreement, Palmer would have been brought to a page that gave him the option of printing the Arbitration Agreement for his records.  *Id.* ¶ 23, Exh. J.

According to Daly, following Palmer's completion of this online Employee Onboarding process, including his execution of the Arbitration Agreement, he began working at Starbucks as a barista in April 2015.  *Id.* ¶ 24.

### B.   Procedural Background

Prior to commencing this action, Palmer brought claims before the New York City Commission on Human Rights and the Equal Employment Opportunity Commission ("EEOC"). *See* Complaint ¶¶ 4-5.  Both actions were closed and the EEOC issued Palmer a Right to Sue letter. *See id.* ¶ 5, Exh. A.  Palmer then timely filed the instant Complaint on August 7, 2023, asserting three causes of action.  Dkt. 1.  The first two causes of action are against Starbucks in violation of New York Executive Law Section 292, New York City Administrative Code Section 8-107, and Title VII: (1) discrimination arising from a hostile work environment based on Palmer's "gender identity (transgender), gender expression, and/or gender," Complaint ¶¶ 82-85; and (2) retaliation based on Palmer's "protected activity of complaining of harassment by co-workers," *id.* ¶¶ 86-88. In the third cause of action, he alleges that the individual Defendants "aided, abetted, incited, compelled and/or coerced" Starbucks's discriminatory and retaliatory conduct, in violation of New York Executive Law Section 296(6) and New York City Administrative Code Section 8-107(6). *Id.* ¶¶ 89-91.  As relief, Palmer seeks, *inter alia*, compensatory and punitive damages, as well as injunctive relief clearing his personnel file of any disciplinary action and reinstating his employment.  *Id.* at 17.

On January 19, 2024, Defendants filed their motion to compel arbitration, attaching the Daly Affidavit.  Dkt. 29 ("Motion").  Palmer opposed the motion on March 1, 2024 and filed a

declaration from himself in support of that opposition.  Dkts. 32 ("Opposition"), 33.  Defendants then filed a reply brief in further support of their motion on March 15, 2024.  Dkt. 35.

## II.      Legal Standards

Under the Federal Arbitration Act ("FAA"), a written agreement to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "The FAA embodies a national policy favoring arbitration founded upon a desire to preserve the parties' ability to agree to arbitrate, rather than litigate, their disputes." *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019) (internal quotation marks and brackets omitted); *accord State of N.Y. v. Oneida Indian Nation of N.Y.*, 90 F.3d 58, 61 (2d Cir. 1996).  But this "policy in favor of arbitration is limited by the principle that arbitration is a matter of consent, not coercion.  Specifically, arbitration is a matter of contract, and therefore a party cannot be required to submit to arbitration any dispute which [it] has not agreed so to submit." *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 395 (2d Cir. 2015) (internal quotation marks omitted) (alteration in original); *see Doctor's Assocs.*, 934 F.3d at 250 (explaining that the FAA "intended to place arbitration agreements upon the same footing as other contracts," and arbitration remains "a creature of contract" (internal quotation marks and brackets omitted)).

Pursuant to the FAA, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  Yet, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof."  *Id*.  Further,

unless a "jury trial [is] demanded by the party alleged to be in default, . . . the court shall hear and determine such issue." *Id.*

In determining whether to compel arbitration, the Court applies a standard similar to that used at summary judgment and must construe all reasonable inferences in favor of Palmer, the non-moving party. *See Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 49 (2d Cir. 2022) ("Because motions to compel arbitration are governed by a standard 'similar to that applicable for a motion for summary judgment,' a court must 'draw all reasonable inferences in favor of the non-moving party.'" (quoting *Nicosia*, 834 F.3d at 229)); *cf. Spinelli v. City of New York*, 579 F.3d 160, 166 (2d Cir. 2009) (explaining that in considering a motion for summary judgment, a court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment" (internal quotation marks omitted)).

Before compelling arbitration, the Court performs a two-step inquiry that looks at contract law principles "governed by state rather than federal law." *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 365 (2d Cir. 2003). At step one, the Court looks to see whether "the parties enter[ed] into a contractually valid arbitration agreement." *Id.* A "basic tenet of contract law," including in New York,[4] is that for a contract to be binding, there must be "a 'meeting of the minds' and a 'manifestation of mutual assent.'" *Starke*, 913 F.3d at 288-89 (citing *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999)).

---

[4] A court "resolve[s] such agreement-formation questions as [it] would most any contract dispute: by applying the law of the state at issue." *Barrows*, 36 F.4th at 50 (citation omitted). The parties appear in agreement that New York substantive law on the formation of a contract applies. *See* Motion at 9; Opposition at 2. In light of that apparent consent, the Court applies New York substantive law to the question of whether the parties formed a contract. *See Texaco A/S v. Com. Ins. Co.*, 160 F.3d 124, 128 (2d Cir. 1998) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry." (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997))).

"The manifestation of mutual assent must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Id*. at 289 (citing *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 417 N.E.2d 541, 543 (N.Y. 1981)); *accord Express Indus. & Terminal Corp.*, 715 N.E.2d at 1053.  At step two, the Court first asks "whether a court or an arbitrator should decide if the dispute falls within the scope of the agreement to arbitrate." *Convergen Energy LLC v. Brooks*, No. 20 Civ. 3746 (LJL), 2020 WL 5549039, at *13 (S.D.N.Y. Sept. 16, 2020).  "[I]f the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019).  But if it does not, then the Court must determine whether "the parties' dispute fall[s] within the scope of the arbitration agreement." *Nackel*, 346 F.3d at 365.

### III.    Discussion

#### A.    The Existence of an Agreement to Arbitrate

The threshold question is whether Palmer executed the Arbitration Agreement as part of his onboarding at Starbucks.  That is a question for this Court to decide.  "While parties may 'agree to arbitrate threshold questions such as whether the arbitration clause applies to a particular dispute, . . . parties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place.'" *Hamrit v. Citigroup Glob. Mkts., Inc*., No. 22 Civ. 10443 (JPC), 2024 WL 1312254, at *5 (S.D.N.Y. Mar. 26, 2024) (quoting *Doctor's Assocs*., 934 F.3d at 251 and citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299-301 (2010)).

Defendants bear the initial burden of showing that an agreement to arbitrate was made. *Barrows*, 36 F.4th at 50 ("[T]his burden does not require the moving party to show initially that the agreement would be enforceable, merely that one existed." (internal quotation marks omitted));

*see also Almacenes Fernandez, S. A. v. Golodetz*, 148 F.2d 625, 628 (2d Cir. 1945); *Blatt v. Shearson Lehman/Am. Express Inc.*, No. 84 Civ. 7715 (CSH), 1985 WL 2029, at *2 (S.D.N.Y. July 16, 1985).  Defendants have met this burden.

Palmer argues that "there is no evidence that Plaintiff actually signed an arbitration agreement, either by hand or electronically."  Opposition at 2.  This is inaccurate.  As Starbucks's Director of Talent Acquisition, Daly is familiar with the company's hiring procedures and employment policies and practices and has access to onboarding data from the time Palmer applied for and began his job.  *See* Daly Affidavit ¶¶ 3-4.  In her Affidavit, Daly explained in detail the job application and onboarding processes for non-managerial retail employees, providing various documents demonstrating that process as well as information concerning Palmer's onboarding.  She explained that, first, as part of a pre-application disclosure page, Palmer as a job applicant would have been notified: "It is Starbucks policy that after October 1, 2014, all new hires shall be subject to an arbitration agreement as a condition of employment."  *Id.* ¶ 8, Exh. B.  Then, after Palmer received an offer of employment from Starbucks, he completed the Employee Onboarding process online.  *Id.* ¶¶ 13-14.  To proceed with that process, Palmer would have consented to receive and respond to notices electronically.  *Id.* ¶ 16, Exh. D.  Palmer then would have received electronically various forms, including the Arbitration Agreement which expressly provided that arbitration was the only forum to resolve claims relating to employment, "including those concerning any element of . . . harassment, discrimination, retaliation, . . . or termination of employment."  *Id.*, Exh. G.  Palmer only could have proceeded in the online Employee Onboarding process once he electronically signed that Arbitration Agreement, which in turn only could have occurred after he viewed that document.  *Id.* ¶ 20, Exh. F.  In addition to explaining this process in detail, Daly attached excerpts from Palmer's RHH file, which reflects that Palmer electronically

signed the Arbitration Agreement on April 13, 2015, at 11:41 a.m.  *Id.* ¶ 21, Exh. H.  As Daly explained, "[t]he 'Onboarding' tab in Plaintiff's RHH file could not indicate that he electronically signed the Arbitration Agreement unless Plaintiff clicked on the 'Sign' link next to the Arbitration Agreement or the 'Sign All' link below the Arbitration Agreement while logged in to RHH."  *Id.* ¶ 21.  In addition, Daly explained that after Palmer electronically signed the Arbitration Agreement, an email was sent to the Palmer Email—an email address that Palmer himself provided during the job application process.  *Id.* ¶ 22; *see id.* ¶ 7; *see also* Palmer Declaration ¶ 5 (Palmer acknowledging that the Palmer Email is his email).  Palmer's RHH file likewise reflects that the email confirming his execution of the Arbitration Agreement was sent to the Palmer Email.  Daly Affidavit ¶ 22, Exh. I.

While Defendants have not presented the actual Arbitration Agreement that Palmer signed, "[t]he FAA does not require the Defendants to produce a signed copy of the Arbitration Agreement."  *Marcario v. Midland Credit Mgmt., Inc.*, No. 17 Civ. 414 (ADS), 2017 WL 4792238, at *4 (E.D.N.Y. Oct. 23, 2017) (citing *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987)); *see Weiss v. Am. Express Nat'l Bank*, No. 19 Civ. 4720 (JPO), 2020 WL 6807628, at *2 (S.D.N.Y. Nov. 18, 2020) (granting motion to compel where the nonmovant received the contract agreement, benefited from the contract, and the movant provided a reliable example agreement).  Here, the detailed information provided in the Daly Affidavit, combined with the attached exhibits including records from Palmer's RHH file, overwhelmingly establishes that an arbitration agreement existed with Palmer prior to him commencing his employment with Starbucks, even without Defendants providing the actual signed agreement.  *Cf. Barrows*, 36 F.4th

at 50 ("[The defendant] produced an arbitration agreement that appears to bear [the plaintiff]'s electronic signature, and thereby cleared this bar.").[5]

The burden then falls on Palmer to "demonstrat[e] a 'substantial issue' on the existence *vel non* of an agreement to arbitrate." *Blatt*, 1985 WL 2029, at *2 (quoting *Almacenes Fernandez*, 148 F.2d at 628). This requires Palmer to come forward "with at least *some evidence* to substantiate [his] denial that an agreement had been made." *Barrows*, 36 F.4th at 50 (cleaned up) (emphasis added) (internal quotation marks omitted); *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995) ("If the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." (citations omitted)).

Palmer has failed to show a genuine issue of material fact to warrant a summary trial on whether he entered into the Arbitration Agreement. Palmer presents no reason to question the integrity or accuracy of any of the detailed information in the Daly Affidavit regarding the employee application and onboarding process at Starbucks at the time of his application. In fact, Palmer's evidence largely substantiates Starbucks's position, as he concedes that he electronically filled out onboarding paperwork and acknowledges that the email address Starbucks claims to have used to confirm his execution of the Arbitration Agreement is his actual email. Palmer Declaration ¶¶ 2, 5. Palmer instead claims that he does not recall signing an agreement to arbitrate during the hiring and onboarding process. *Id.* ¶ 2. This stated lack of recollection of signing an arbitration

---

[5] Palmer does not appear to challenge the validity of the Arbitration Agreement on the basis that it would have been electronically signed. *See generally* Opposition. To be sure, however, courts consistently enforce arbitration agreements that were electronically signed. *See, e.g.*, *Armstead v. Starbucks Corp.*, No. 17 Civ. 1163 (PKC), 2017 WL 5593519, at *5-6 (S.D.N.Y. Nov. 17, 2017) (enforcing Starbucks's Arbitration Agreement to compel arbitration in a wage-and-hour suit).

agreement is insufficient to create a genuine issue of fact to warrant a trial.  *See Barrows*, 36 F.4th at 51 ("Where a party merely states that she cannot *recall* signing an agreement (as opposed to denying she has done so), such a declaration ordinarily fails to create a triable issue of fact." (citing *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75 (2d Cir. 2000)); *see also Gonder v. Dollar Tree Stores, Inc.*, 144 F. Supp. 3d 522, 528 (S.D.N.Y. 2015).  Nor does Palmer's statement that he cannot find the confirmation email in his inbox create a genuine issue of material fact.  *See* Palmer ¶ 5.  Palmer's Declaration is dated March 1, 2024, *id.* at 2; it is certainly understandable that he would not be able to find the April 2015 confirmation email nearly nine years after it would have been sent.

Accordingly, Defendants have established that the parties entered into a contractually valid arbitration agreement.

## B.    Scope of the Arbitration Agreement

Having concluded that the Arbitration Agreement is binding on Palmer, the Court turns to whether that agreement delegates questions of arbitrability to an arbitrator.  "Under the FAA, there is a general presumption that the issue of arbitrability," *i.e.*, the question of whether a particular issue is to be arbitrated, "should be resolved by the courts."  *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005); *see First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995).  However, "[j]ust as the parties may elect through their contract to have arbitrators (rather than a court) resolve categories of disputes between them, they may similarly contract to have arbitrators (rather than a court) decide whether a particular dispute is to be arbitrated under the terms of the contract."  *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 189-90 (2d Cir. 2019).  "[W]hen the parties have contracted to submit the question of the arbitrability of a dispute to arbitrators, courts must respect and enforce that contractual choice."  *Id.* at 190.  "Courts should

16

not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options of Chi.*, 514 U.S. at 944 (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)) (alterations in original).

The Arbitration Agreement clearly delegates the question of arbitrability to the arbitrator. The agreement contains express delegation language: "Except as provided below,[6] Starbucks and I agree that the Arbitrator—and not a court or agency—shall have exclusive authority to resolve any dispute regarding the formation, interpretation, applicability, enforceability, or implementation of this Agreement, including any claim that all or part of this Agreement is void or voidable." Arbitration Agreement at 1. The Supreme Court in *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010), considered a nearly identical delegation provision[7] and held that unless an employee "challenge[s] the delegation provision specifically," a court must treat the delegation provision as "valid" and "enforce[able]." *Id.* at 72; *see also Bar-Ayal v. Time Warner Cable Inc.*, No. 03 Civ. 9905 (KMW), 2006 WL 2990032, at *7-8 (S.D.N.Y. Oct. 16, 2006) (finding a clause providing that "the arbitrability of disputes shall be determined by the arbitrator . . . constitutes sufficiently clear and unmistakable evidence that the parties intended to have issues of arbitrability decided by the arbitrator"); *Ahmed v. Citibank, N.A.*, No. 19 Civ. 4439 (MKB) (SJB), 2020 WL 2988666, at *5 (E.D.N.Y. June 2, 2020) (holding that virtually identical

---

[6] Certain exceptions to the mediator's exclusive authority are articulated in the Arbitration Agreement, none of which is relevant here. The agreement provides that a court shall decide "[a]ny question or dispute concerning the scope or validity of" a provision that requires claims to be brought only on an individual basis and waives the employee's right to pursue class, collective, consolidated, or representative claims. Arbitration Agreement at 1. The Arbitration Agreement further notes that, under the National Labor Relations Act, the employee "may be entitled to act concertedly or cooperate with others to challenge this agreement in any forum." *Id.*

[7] The delegation provision in *Rent-A-Center* stated that "[t]he Arbitrator . . . shall have exclusive authority to resolve any dispute relating to the . . . enforceability . . . of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable." 561 U.S. at 68 (alterations in *Rent-A-Center*).

delegation clauses "expressly require[] that claims regarding the enforceability of the arbitration agreement must be delegated to the arbitrator").

* * *

To summarize, Defendants have established by a preponderance of the evidence the existence of a binding arbitration agreement with Palmer.  In response, Palmer has failed to create a genuine issue of fact as to his execution of that agreement to warrant a summary trial under the FAA.  To the contrary, Palmer's evidence only further confirms that he entered into that agreement, as he acknowledges that he electronically completed onboarding paperwork and he confirms the accuracy of the Palmer Email that Starbucks used to confirm his execution of the Arbitration Agreement.  Indeed, all the evidence presented to the Court overwhelmingly establishes that Palmer electronically signed the Arbitration Agreement on April 13, 2015 as part of his onboarding process.  Defendants also have established that any questions as to the scope of the Arbitration Agreement should be decided by the arbitrator pursuant to the delegation language of that agreement.  The Court therefore grants Defendants' motion to compel arbitration.

## C.    Waiver

The Court briefly pauses to address Palmer's complaint that Defendants failed to mention the Arbitration Agreement while his claims were before the New York City Commission on Human Rights.  *See* Palmer Declaration ¶¶ 3-4.  He argues that it is "truly perplexing" that Defendants would adjudicate these disputes in the City Commission for years, without referencing any arbitration agreement, only now moving to compel arbitration.  Opposition at 6.  To the extent Palmer is suggesting that Defendants waived their right to now seek enforcement of the Arbitration Agreement, he offers no legal basis for this Court to find waiver or otherwise estop Defendants from relying on that agreement.  Indeed, the Supreme Court has explained that "the mere

involvement of an administrative agency in the enforcement of a statute is not sufficient to preclude arbitration." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28-29 (1991).  And "[m]erely responding to a complaint made to an administrative agency, or engaging in the minimal level of litigation undertaken by [Defendants], does not rise to the substantial, prejudicial level of activity required to demonstrate waiver in this Circuit."  *Gonder*, 144 F. Supp. 3d at 529; *see id.* ("[The defendant]'s participation in the EEOC and [New York State Division of Human Rights] investigations, while engaging [the plaintiff]'s claims on their merits, is not considered 'litigation' for the purposes of determining waiver.").  And in any event, to the extent Palmer seeks to argue waiver or delay, those arguments are appropriately made to the arbitrator.  *See Empire Asset Mgmt. Co. v. Best*, No. 21 Civ. 1798, 2022 WL 893402, at *1 (2d Cir. Mar. 28, 2022) (summary order) (affirming the district court's conclusion that broad language in an arbitration agreement that "controversies under or relating to any activity or this agreement . . .  shall be determined by arbitration" committed the plaintiff's statute of limitations defense to the arbitrator); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, [including] an allegation of waiver, delay, or a like defense to arbitrability.").

**D.     Stay Pending Arbitration**

In addition to seeking an order compelling arbitration, Defendants ask the Court to dismiss this action or, alternatively, to stay it pending arbitration.  Motion at 1, 13-14.  Palmer requests that, if this Court were to compel arbitration, the Court stay this action pending the outcome of arbitration.  Opposition at 6-7.  The Supreme Court recently made clear that "[w]hen a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."  *Smith v. Spizzirri*, --- S. Ct.

----, 2024 WL 2193872, at *4 (2024); *accord Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015) ("We . . . consider a stay of proceedings necessary after all claims have been referred to arbitration and a stay requested.  The FAA's text, structure, and underlying policy command this result.").  Accordingly, the Court stays this action pending arbitration.

## IV.    Conclusion

In sum, Defendants have shown by a preponderance of the evidence the existence of an executed arbitration agreement with Palmer, which contains language delegating questions of scope and enforceability to the arbitrator.  Palmer has not shown a genuine issue of fact relating to this evidentiary showing, nor can he avoid arbitration by making a generalized complaint of delay. As such, the Court grants Defendants' motion to compel arbitration and stays this action pending that arbitration.  The Clerk of the Court is respectfully directed to close the motion at Docket Number 29.

SO ORDERED.

Dated: May 28, 2024
       New York, New York

_____
       JOHN P. CRONAN
       United States District Judge